v. WATSON LABORATORIES 2010-13-31 Thank you, your honors. And may it please the court, I'm Mark Jansen for Watson Laboratories, representing Watson Laboratories. And I want to say, first of all, this is not a case of first impression like the last one the court heard. This is, I think, a relatively straightforward case, like many others this court has looked at, where the trial court, in ruling on a summary judgment motion, inappropriately weighted the evidence and determined that Watson had not presented clear and convincing evidence sufficient to prove obviousness of Duramed's oral contraceptive regimen that's at issue in this case. You're saying there are genuine issues of material fact? There are many, many issues of genuine issues of material fact, your honor. I think this case is a clear and easy case of obviousness under KSR v. Teleflex and other decisions of this court, such as the Alzar case, Daiichi-Sanko, Dystar. You're not saying the claims are obvious as a matter of law? I'm not. No, no, absolutely not. It shouldn't be a trial. We did not move for summary judgment of obviousness as a matter of law. There are questions of fact going to the level of skill in the art and how one of the ordinary level of skill in the art would interpret the prior art, the teachings in the prior art, especially with respect to suggestion, motivation, and teaching to combine the references. But in this case, like in KSR, like a scientific commonwealth, commonwealth scientific, in other cases, to cut to the chase here, there are two. What DuraMed did was it took a standard known oral contraceptive regimen of 84 days, which was the COVAX reference, and it added to that a known, instead of the placebo period, the standard placebo period of seven days, added seven days of unopposed low-dosed estrogen, and ethanol estradiol is the standard estrogen used in these pills. And that is disclosed very clearly by the 749 patent, the Schmidt-Goldwitzer patent, that was published in 1997 as a PCT application and later as a U.S. patent in 2000. So you've combined two references, and those two references are the claims, are claimed by the Claim 19 of the 969 patent. So under the clear case law of KSR, DISTAR, commonwealth scientific, the list goes on. What we needed to show in addition was some evidence, motivation, suggestion, or teaching in the prior art that indicates there would be a likelihood of success, a reasonable likelihood of success, of using that unopposed estrogen to follow the 84-day standard combination oral contraceptive dosing. And that's what we submitted to the court below. And I think the issue here is that really there's so much substantial evidence we submitted in the record showing that the problem of estrogen withdrawal for women that were on oral contraceptives, and it's not a universal problem. Some women are affected, and each woman has a different need for different oral contraceptive regimens. That's why there are different oral contraceptive regimens. Some women have more problem with estrogen withdrawal during the pill-free period than others, and for them there's a problem that's been solved. And it's a recognized problem. It was recognized at least as early as 1992 in the Zacker article, which we referenced. And the recognition is repeated in other prior arts, such as the 1997 Sulak article and the 2000 Sulak article. Patricia Sulak was the author of those articles, and she actually did study, among other things, in 1997, the COVAX and other extended regimens and found that headaches were more prominent during the pill-free period. And in the 2000 article that she wrote, she very clearly stated that one solution was the use of unopposed estrogen during the pill-free period. Now, the trial court below— Except her testing didn't involve a regimen with unopposed estrogen, did it? Her testing did not include a regimen with unopposed estrogen. She did not test unopposed estrogen, I will say that. She tested standard oral contraceptive regimens of—in the case of the 1997 article, she tested— No, she tested, actually, 84 days extended regimens. If you look at her 1997 article, and it's in the record at page 1225, 1224, you'll see that in 1224 she actually tested the COVAX regimen. Table 1 shows that COVAX was one of the regimens that she actually tested. I'm looking at February 2000. I'm talking about February 1997, which starts at page 1223. You'll see that if you take a look at this particular article, that she actually—it shows she studied COVAX. COVAX is actually the first item—the first regimen listed in Table 1 at the top of page 1224. And she explains in the materials and methods that the patients were offered extensions of the number of weeks of active OCs. And she concluded in her discussion at the next page, 1225, that all participants complained of at least one symptom during the pill-free interval, with 76 experiencing menstrual migraines during that period. And she actually then concludes, with respect to women that were on the extended method, that this was a problem—that is, the withdrawal headaches, the estrogen withdrawal headaches during the pill-free period were a problem even in the extended period. There's a statement that, with respect to one patient as an example, that patient did not consider the problem of breakthrough spotting and bleeding, which is a problem with extending for 84 days, a problem, because she obtained more benefit not by eliminating but by, quote, delaying the onset of migraine headaches. So one of the problems with the way DuraMed has approached this case is to say the extension of the pill-free period as in COVEX alone solves the problem of withdrawal headaches, what are called withdrawal headaches. But that's not the case. What happens is it means by extending, having extended regimen for 84 days, there is no withdrawal for 84 days. But then there is that withdrawal once you get to the end of the 84 days. And women that suffer severe migraine headaches during that withdrawal period will have this problem. And it's recognized in SULAC as a problem, and she documented it there. And it's the 2000 article, which the district court ignored entirely, at least as far as its opinion is written. I think that the district court may have been confused and kind of lumped those two references together. But clearly, the SULAC 2000 article says very clearly, as a conclusion, explains that these headaches are the result of withdrawal of estrogen. And the effect of estrogen withdrawal on the vasculature, which then causes headaches, and specifically suggesting that adding estrogen during the typical seven hormone-free days could also provide better ovarian suppression and decrease symptoms. So, I mean, I think SULAC alone has got the identification of the problem both generally and specifically with respect to the COVEX regimen, as well as a suggestion and motivation to come in just right there. But, of course, we go to the other references we cited. The 749 patent, the Schmidt-Goldwitzer patent, is basically a patent which says, look, recognize there's a wide range of progestins and estrogen combinations that can be used and have been used for the combined oral contraceptive portion of the regimen. Recognizing there's a problem with hormone withdrawal during the pill-free interval, clearly disclosed and claimed. The 749 patent had different dosages and a different dosage regimen time. The 749 patent has, you know, and that's, I think, one of the, Your Honor, I think it's one of the things I thought the court below was somewhat confused by and I think made an error was it seemed to require anticipation by that patent. That patent, I think, is what really is very strong for us in the sense that, yes, it did discuss slightly different regimens during the pill-free interval. It does disclose a 77 up to 84 days. It does say 84 days, but this is not an anticipation case. The key reference in that is the addition of the 7 days of unopposed estrogen at exactly the same dosage claimed by this patent, 10 micrograms, for the purpose of alleviating withdrawal symptomology. So that patent clearly teaches the reason for doing this and is solving these problems with hormone withdrawal, especially estrogen withdrawal, and that's stated very clearly in Column 9 of that patent. Now, I think the way I personally have sort of analogized this case is that in the last 50 years that oral contraceptives have been on the market, there's been a lot of tinkering and adjusting, and as a result, it's similar to the car industry. There's a lot of chassis out there. There's a lot of basic models, and there's been a new feature that's been recognized. There still is a problem with hormone withdrawal. It's similar, in my view, as an analogy to rain on the windshield of a car, okay? It's been recognized. What is the solution? A windshield wiper. So you add that windshield wiper to the chassis, but once the windshield wiper is a known function or a known option that can be added to a car, it doesn't matter whether you put it on a GMC truck or a Volkswagen Jetta. Now, Judge Dyk is laughing at my analogy, but it's the best I could come up with, Your Honor. Every one of these facts is on this side is the best analogy, which isn't helpful. Okay, I'm sorry. Your facts are better than your analogy. Thank you very much. Okay, I'll reserve time. Thank you. Thank you. Mr. McKibbin. May it please the Court. In this 969 patent, Duramed is not claiming the general idea of adding estrogen to a hormone-free interval. How come there's no issue of obviousness here? That seems strange. Well, I think— Given these prior references, which say there's a headache problem during the withdrawal period, you can solve the headache problem by low-dose estrogen. Some of the patents actually cover that. So how can there not be an issue of obviousness? Well, here's why we believe there's not, Your Honor. First of all, most of the references that they cite to that talk about headache problems from estrogen withdrawal are 28-day cycles. Not all of them are. No, I'll get to that, Your Honor. But obviously, we're claiming a 91-day cycle, which the evidence that's undisputed in the record shows that those two cycles behave differently with regard to side effects. And there's no dispute about that. The reference that was being discussed under Watson's questioning this morning was the 97 Sulak article, which I think that's a very important article to look at and understand its results. Because what the 97 Sulak article says is that the extended regimens prevent or reduce headaches, that an extended regimen like Sulak was testing is a cure for estrogen withdrawal. It doesn't cause it, and therefore you wouldn't add. There's no problem there to start with. And you wouldn't add more estrogen into that regimen. And I'll show the court. But the 2000 Sulak reference suggests adding estrogen. The 2000 Sulak article tests only 28-day regimens. And it found, as other art has. But as Judge Teich said, all these pieces are in a limited number of pieces of prior art. You've got the 84 days of COVAX. You've got the 749 pattern, which adds low-dose estrogen. And you've got Sulak that suggests adding low-dose estrogen. I understand there are several references, but our position is... I don't believe, Senator, because of the one point that we think is undisputed, and there's no evidence to the contrary, that there is no evidence that extended regimens like this 91-day regimen lead to estrogen withdrawal headaches as a result of the hormone-free interval. The Sulak 97 article was testing 91-day regimens with a 7-day hormone-free interval that had no unopposed estrogen. And if we look at pages A1225... The 749 pattern has regimens going up to 84 days. It does. What's the difference between 84 and 91? I mean, what's the deal? Well, that's a different question about the 749 pattern, Your Honor. The 749 pattern, as I think even Watson's expert admits, is like a laundry list of ingredients and time periods with nothing stated as being what they're preferring or they're recommending. Another key about it is that it says repeatedly that you want to use the lowest dosage possible of hormones. And throughout the 749, despite all of its combinations, the maximum dosage that it discloses are 20% less than the dosage of the 969 pattern. It teaches against the notion of taking something out of the 749 pattern and trying to combine it with higher dosage regimens such as we have in the 969 pattern. In addition... How does it do that? How does it do that? Because it says use lowest dosage as possible. It only goes up to 125 micrograms of progestin and... We're talking about what you do during the interval, the 7-day interval. But that interval is... It talks about the 7-day interval, right? Yes, Your Honor, but that interval... It says during that interval if there's a headache problem, it says to alleviate symptoms you use low-dose estrogen, right? It does say that, but here's my point, Your Honor. We're just not claiming... That was my starting point. We're not claiming the general idea of doing that. It's a very specific claim in Claim 19 of specific dosages and time periods. What it sounds to me is that you're saying something can't be obvious unless there's a specific suggestion to do exactly what the patent claims. No, what I'm saying is that if there is a whole variety of possible solutions to estrogen withdrawal, which there are in this art, there's a whole variety of them. It's not obvious to pick one out and apply it to a situation where the very patent says we wouldn't make that combination. They say they wouldn't combine it with higher... They wouldn't use it in a higher-dose setting because they say higher dosages are bad. And to determine for the 969 what level of unopposed estrogen you're going to have, you need to know what the combination pill is because estrogen withdrawal is a withdrawal from the estrogen that's in the original combination pill. So in our original combination pill, we have 30 micrograms of estrogen. So you get to the 7 days, what level are you going to put into that unopposed period? You're going to put estrogen in. How much is it going to be? You can't just make guesses. There's variations in the prior art. There's some references that say you take 100%. Some say you reduce it by 50%. Some say... There's nothing that you can point to that says, oh, now we know for our 30 micrograms that we're going to add 10 micrograms in the unopposed estrogen setting. Just because it says 10 in the 749 patent doesn't mean that that's what you do when you have a different combination pill. They don't even have our combination pill in the 749 patent anywhere. You can't find it. You're arguing that there are genuine issues of fact. No, Your Honor. I'm saying that in a situation where you have, first of all, no problem. They haven't shown the problem. What you're really arguing is that you can't have obviousness unless there's an anticipatory reference. That's what it sounds like to me. I'm certainly not trying to say that, Your Honor. But my fundamental point is that you don't get it to any reason to combine this unless you have a problem in the first place. In the 97 COVAX... Excuse me. COVAX says headaches are spread out throughout the entire regimen, and Watson's expert admitted he didn't have any idea whether they were caused by estrogen withdrawal. But if you look at all of these references and you look at them from the standpoint of the non-movement, it's hard to say that there's no genuine issue of material fact as to whether there might be a reason to combine. I don't believe, Your Honor, that if you look at these references on the undisputed disclosures they make, that any of them disclose that an extended regimen like the 969 patent or COVAX, which is their base reference, would lead to estrogen withdrawal headaches. When Sulak tested it in 1997 and she ended up with, I think it was at the bottom of A1225, there were 27 patients who previously had headaches when they had their original regimens. When they took extended regimens for more than a year, a number of them reported bleeding, two reported breast tenderness, only one had any complaint about headaches. That's consistent with what COVAX said, which is headaches are spread out throughout, it's not a hormone-free interval problem. We talked about Sulak's 2000 article. That studied the 28-day regimen and found that there were headaches. She says, what's the solution for that? She gives three possibilities. One of her possibilities is extend the regimen, which is just what... One of her possibilities is low-dose estrogen. Right, and there's a number... But what she's saying is if you extend the regimen, that's a way to cure headaches. You don't do both. It sounds to me like you're making your closing argument at the end of a trial and resolving these questions is not a reason to support summary judgment. What I'm trying to do, Your Honor, is explain what these references say specifically. It's easy to generalize and say, well, they show estrogen withdrawal. But if you look at the actual results of people that studied this field of extended regimen contraceptives, what those results show is they do not cause estrogen withdrawal headaches. If they don't cause the estrogen withdrawal headache, you're not going to put more hormones into the product. That wouldn't be healthy. That wouldn't be wise. And no one has suggested you would do that. They want to gloss over that. They want to say, well, you would do that anyway because other 28-day regimens say there's headache problems, so add something to it. That's too simplistic. That's not a fair reading of the references. And I don't think that the way to resolve this is to say, well, there's an estrogen problem in some regimens. Let's add estrogen, so that makes it obvious regardless of what you start with. We're starting with a 91-day regimen, which was a relatively new phenomenon. There were a couple people studying it. The results we've spoken to as being undisclosed, and they show there wasn't a problem. If there's not a problem, their case falls apart, which is what the district judge recognized. I think that in looking at 97-SULAC, that shows it. 2000-SULAC confirms it. And the 749 patent simply provides a solution where there's no problem to start with. Thank you, Mr. McKinnon. Thank you. Any questions? Mr. Jansen has a little rebuttal time. Thank you, Your Honor. I don't have much to say. Just that I think the entire argument here, arguing what SULAC 1987 means, what it teaches or doesn't teach, what SULAC 2000 does or does not teach, what the 749 patent does or doesn't teach, I mean, those are fact questions. And our expert, Dr. Michael Thomas, explained in his report how he felt one of ordinary skill in the art would perceive those references and that they would be motivated to use the seven days of unopposed. So the fact arguments here and the fact that the judge, the court below, found really essentially as a matter of fact that there were no problems identified or solutions identified in the prior art was I think simply an improper factual determination by the district court below, which he should not have been making given the evidence we submitted, which was that there was, just like in the Freeman case and other cases where this court has reversed findings of non-obviousness, there was adequate evidence to go to trial. One last thing. We do, and I do want to comment on this, we did, in part of our appeal, address the issue that the judge excluded some testimony regarding medical school teaching of the use of unopposed estrogen and also clinical practices that were known to our expert, Dr. Thomas. I want to stress that that evidence is not anything we're relying on in opposing summary judgment. We recognize that there are cases by this court, Finnegan and others, that would indicate that's not admissible, or at least not. But I want to stress that we believe the proper rule should be that, and I really have some questions about that evidence exclusion rule, and we've raised them in our brief, but just to say that that is in no way what evidence we think is needed to establish a clear and convincing evidence case. It's corroborative. It's additional evidence, and we think the rule should be, and we think it's been stated by this court, that that evidence is not inadmissible, except maybe under Rule 403, if it's highly suspect in some ways, but that it's insufficient by itself to support a judgment of obviousness, but it should be admitted. And that's a matter for remand, but it's not part of our summary judgment opposition. Thank you very much. Thank you, Mr. Jensen. In case you could take another bite. All rise. The Honorable Court is adjourned on May the 10th.